Phillip Bordages Estate Trust v. Commissioner.
Phillip Bordages Estate Trust v. Commissioner
Docket No. 4555.
United States Tax Court
1945 Tax Ct. Memo LEXIS 42; 4 T.C.M. (CCH) 995; T.C.M. (RIA) 45341; November 7, 1945
R. P. Cannon, Esq., 909-13 Sinclair Bldg., Fort Worth, Tex., and Will E. Orgain, Esq., Gilbert Bldg., Beaumont, Tex., for the petitioner. Stanley B. Anderson, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent has determined that there are deficiencies in income tax for the years 1939, 1940, and 1941 in the amounts of $562.87, $5,603.01, and $14,116.30, respectively; and deficiencies in declared value excess profits tax for the same years in the amounts of $540.36, $3,799.92, and $6,117.26, respectively. Respondent now concedes that there are no deficiencies in the declared value excess profits tax. There is only one question left in issue, which is whether the petitioner, a trust, is an association taxable as a corporation. *43 Respondent has included in petitioner's taxable income all of the long-term capital gains realized in the taxable years from the sale of capital assets because of his determination that petitioner is an association which is taxable as a corporation. The conclusion reached herein upon the question, as stated above, will determine whether respondent was correct in his treatment of certain capital gains. Findings of Fact The income tax returns for the years involved were filed with the collector for the first district of Texas, at Austin. Just prior to April 14, 1936, the following seven persons conveyed their undivided interests in real property and oil and mineral leases on property to J. E. Broussard, J. A. Bordages, and E. J. LeBlanc, trustees; Mary Belle Broussard, Nora LeBlanc, Louis Bordages, J. A. Bordages, James Dennis Bordages, Asa C. Bordages, and Wheeler Bordages, Asa and Wheeler Bordages are grandchildren of Phillip and Ella Bordages, deceased, the children of Asa Bordages, deceased. All of the others are children of Phillip and Ella Bordages, who died in 1891 and 1889, respectively. On April 14, 1936, Broussard, Bordages, and LeBlanc, trustees, made a declaration *44 of trust for the above-named persons as the seven beneficiaries of the trust. The trust instrument created to be known as "The Phillip Bordages Estate Trust." Petitioner is that trust. The trust was created for a term of 25 years, to terminate April 14, 1961. The property conveyed to the trustees is described in lists attached to the trust in three groups, A, B, and C. The above-named persons had inherited some of the property which was held by the trustees in the taxable years from Phillip Bordages, in which they held undivided interests, as tenants in common. The interests had been held, undivided, since 1891, except that some of the heirs had, from time to time, purchased interests of others of the heirs in pieces of property. Also, since 1891, the heirs had acquired additional lands or interests in lands, in fee, or under leases of mineral deposits in the land. Also, upon the death of Asa Bordages, his interest in the estate of Phillip had passed to two sons, Asa and Wheeler. Included in the estate of Phillip is a piece of land with a building located in the town of Beaumont, Texas. The property which was inherited from Phillip was located in Jefferson County, Texas. The other *45 property held by the three trustees was property out of the estate of I. R. Bordages, a son of Phillip, who died intestate on December 24, 1934, survived by a wife. He had no children. He died possessed of the undivided interest which he had received in the estate of his father, Phillip. Phillip had been survived by seven children, two daughters and five sons, the sons being, Louis, J. A., James Dennis, and Asa (deceased), and I.R. (deceased). The heirs of I.R., including his widow, entered into a contract on January 10, 1935, by the terms of which the estate of I.R. was distributed eventually. Under this agreement, the seven persons, above named, who conveyed certain property to the three trustees in April, 1936, were given two-fifths of the residue of the estate of I.R. Their two-fifths interest was conveyed, subsequently, to the trustees of the trust which was created on April 14, 1936. The trustees of the petitioner-trust, accordingly, held in the taxable years, the undivided interests of Mary Broussard, Nora LeBlanc, Louis, James Dennis, J.A., Asa, and Wheeler Bordages, in the property which had come from Phillip Bordages, and their undivided interests in two-fifths of the residue *46 of the estate of I. R. Bordages which they received under the contract of January 10, 1935, and which passed to the trustees some time after April 14, 1936. The property and the interests in property which were conveyed to the trustees in April, 1936, consisted of land in which the fee was held, and such land was swamp land, timber land, and farming land, plus the piece with a building. Mineral leases had been given to lessees on some of the land under which royalties were retained, and some of these leases had become productive. The property and the interests which were conveyed to the trustees in 1936 were located in Louisiana and Kentucky, as well as in Texas. The property and interests in property which came from the estate of I.R. included interests in mineral leases. I.R. had been substantially interested in oil properties and in oil leases. In the taxable years, the trustees of petitioner received income from leases, lease bonuses, and rents. In 1940, petitioner received a lease bonus payable in oil in the amount of $10,371.29. The trust indenture which was executed on April 14, 1936, petitioner's exhibit 3, is incorporated herein by reference. The material provisions are *47 as follows: The interests of the beneficiaries in the property of the trust are set forth, the proportionate interests being determined in each group of property held in the trust. For example, the interest of Louis Bordages in the property in group A is an undivided one-sixth; in group B, it is an undivided ten-fifty sixths, and in group C, it is an undivided ten-fifty sixths. The two grandchildren are given an undivided one-twelfth interest in the group A property, and an undivided one-fifty sixth interest in the groups B and C properties. The other four beneficiaries are given an undivided one-sixth interest in the group A property, and their interests in the groups B and C properties are undivided ten-fifty sixths, or fourteen-fifty sixths, or eighteen-fifty sixths. The net income of the trust shall be distributed among the beneficiaries according to the percentage interest of each beneficiary at such times as the trustees may elect. The accounts of the income of the trust have been kept according to the way the property is grouped under the trust, so as to show the income from group A property, group B property, and group C property. Upon the termination of the trust, all *48 of the property is to be distributed within one year from the date of the termination. The trustees are to appoint three appraisers, with the approval of a majority in interest and membership of the beneficiaries. Upon the basis of the appraisals, the trustees are to prepare a schedule of the property to be distributed, and of the proposed allotment to each beneficiary, and, upon the approval of said schedule of allotments by two-thirds in number of the beneficiaries, the partition of the property and the distribution is to be made. If the two-thirds approval is not obtained from the beneficiaries, the trustees may authorize the appraisers to make the partition and allotment, and their determination will be binding upon all of the beneficiaries. Should any beneficiary die before the termination of the trust, his or her interest shall pass, subject to the terms of the trust, according to his or her will, or, if none, according to the laws of descent and distribution of Texas. No assignment, order or, transfer, written or verbal of any beneficiary by way of anticipation or otherwise of any part of the income and principal of the trust shall be paid by trustees to any one except directly *49 to the beneficiary. No part of the principal or income of the Trust Estate or the interest of any beneficiary herein while in the hands of said Trustees shall be subject to attachment by any process, garnishment, attachment or other legal proceedings, nor cause subject to the payment of any debts of any beneficiary or any debts of the estate of any beneficiary. A majority of the beneficiaries, according to their interests, and not by number, may appoint a trustee to take the place of a trustee who has resigned, died, failed to act, or become incapacitated. The trust may be terminated upon the vote and authority of seventy-five percent of the beneficial interest and ownership of the trust, which shall be in writing and recorded. A trustee may, in writing, resign his trust. The trustees are authorized to carry on and conduct any business venture, enterprise, or undertaking on behalf of the trust that they deem advisable. The trustees have the following broad powers: They shall invest and reinvest the trust estate in such lands, leases, securities, and such other personal property as, in their discretion, they deem advisable, and in such real estate within the State of Texas *50 as, in their discretion, they deem advisable, and the trustees have the power to vary the investments of the trust estate in their discretion. The trustees are authorized to manage, care for, improve, protect, deal with, sell, or otherwise dispose of the trust estate in their discretion in every way in which any owner would do the same. The trustees are given the authority to improve, manage, and subdivide any real estate in the trust estate; to dedicate parks, streets, highways, and tracts for schools; to contract to sell, to grant options, to purchase, to mortgage property of the trust estate; to lease for minerals any property in the trust estate, upon any terms and for any period of time, whether or not the same continues beyond the termination of the trust, and to renew and extend leases upon any terms and for any period, and to amend and modify leases, and to grant options to lease, and to renew leases; and to contract respecting the fixing of the amount of present or future rentals; to partition and to exchange property of the trust estate for other real or personal property; to grant easements of any kind; to sell or lease the coal, oil, gas, or other minerals in or under any *51 property in the trust estate; to purchase, lease or hold real estate or any estate therein. The trustees are authorized to bring and defend suits in respect to the trust estate, and to do any acts necessary for the full protection thereof, and to use such agents and attorneys as they think best. No trustee or beneficiary hereunder shall be personally obligated or liable in any manner on any notes, mortgages, contracts or other obligations made or given by said trustees and any person dealing with said trustees shall look solely to the trust estate and any such note, mortgage, contract, or other obligation may contain an express provision exempting and exonerating said trustees and beneficiaries from all personal obligations and liabilities whatsoever. I. R. Bordages, during his lifetime, had traded in royalties a great deal. Also, he had taken an active interest in the property which he and his brothers and sisters had inherited from their father, Phillip. The heirs of Phillip, hereinafter referred to as the Bordages family, increased their holdings of land during the period between 1910 and 1920, the purchases having been made by I. R. Bordages. He and his brothers and sisters *52 held undivided interests in the property which they purchased. These purchases were made, in whole or in part, by the investment of income received from the property they owned. I. R. Bordages also purchased royalty interests in which he and his brothers and sisters acquired interests. The children of Phillip Bordages referred to the property they had inherited in 1891 as the "Bordages estate," and they referred to the land and royalty interests which they acquired by purchase as purchases for or additions to the estate. But this was due to the fact that they had not caused the property which was acquired by inheritance to be partitioned and distributed. Since the family held their interests undivided, the title to the additional property was taken so that the members of the family acquired undivided interests therein. There was no formal entity, for legal purposes, which could be called "The Bordages Estate." At various times during the forty years after the death of Phillip, the Bordages family gave mineral leases on their property, and they acquired interests in leases. In 1934, oil was being produced from some of their lands. They, the family, were all looking forward to the *53 time when mineral leases in which they had interests would be producing, and many of the leases did produce. I. R. Bordages had traded in mineral leases and royalties a great deal and he thought he knew the values of the properties and the royalties which he bought for himself and for the Bordages family. The Bordages family believed that the value of their properties was in the oil deposits rather than upon the surface. When I. R. Bordages died, the members of the Bordages family consulted an attorney about the future of their property and the best way of managing it. They anticipated their receiving undivided interests in two-fifths of the residue of the estate of I.R. The attorney advised that all of the undivided interests should be conveyed to the three most responsible men in the family, as trustees. He pointed out all of the benefits to be derived from creating a trust, including the simplification of eventual distribution among the members of the family and their heirs. He pointed out the greater ease with which trustees could handle the property in every way, in selling it, leasing it, and making equitable distributions, and that if there were a trust, "there would be no *54 entanglements if some of the children died in the meantime, it being recognized that the mineral interest was involved but they were not subject to partition equitably, and would probably continue to be held at least for a good long period of time." The attorney drew up the declaration of trust executed April 14, 1936, "having in mind that they [the trustees] would have every power connected with the handling of that particular estate, [sic] and making leases, transfers, and distributions, and dealing with that particular estate, [sic] that was being conveyed to them." The members of the Bordages family understood that as matters stood, without putting their property in trust, there was difficulty in getting all of the holders of undivided interests to consent to sales, leases and other transactions and dealings in the family property. They had already experienced problems produced by the unwillingness of one person to join others in giving consent to proposed transactions. A sale or a trade could not be made without consulting each member of the family. Some lived in California; others in New York, in Chicago, and in the south. The consent of all members of the family was *55 necessary in making a sale, lease, or other disposition of the property. They believed that if all of the property was in the hands of three trustees, the land could be sold or leased if the opportunity came. In 1934, and after the death of I. R. Bordages, the members of the Bordages family believed that the properties owned could not be partitioned and divided among the members of the family equitably or economically, and that was an important reason for creating a trust to hold the property. Since the trust, petitioner, was created, the trustees have leased portions of the property held in trust under mineral leases from which they would receive royalties, and for farming. They have collected rents and royalties; they have sold timber, received lease bonuses, dividends, and interest on notes. They have sold parcels of the lands. They have received lease bonuses in oil. The trustees have made distributions to the trust beneficiaries of income from the property. When money is received, the general practice has been to distribute the money. In one instance a tract of land, known as the Fannett tract, was leased, and after oil had been brought into production under the lease, *56 the tract of land, or the lease, or interests therein, was distributed to the beneficaries of the trust in proportion to their interests. The trustees have purchased only two small tracts of land, or small undivided interests, therein, for a few hundred dollars, to facilitate transactions. When a question arose relating to the status of petitioner for tax purposes, the trustees withheld all income instead of making distributions, to create a fund. The petitioner-trust did not have any seal, and it did not issue any certificates of interest. Regular meetings were not held. In 1936, $10,199 was distributed to the beneficiaries. No distributions were made in 1937. In 1939, $3,732.86 was distributed. The net income of the trust for the taxable years 1939, 1940, and 1941, as reported in fiduciary income tax returns, was $3,500.42, $26,596.32, and $43,411.96. During these years rents and royalties were received by the trustees in the following amounts: $2,748.26, $27,841.10, and $43,815.90. During the taxable years sales of land were made and were reported in the returns as follows: 1939 - 2 sales at a total gain of $3,097; 1940 - 4 sales at a total gain of $1,411.22; 1941 - 3 sales *57 at a total gain of $2,030.97. Also, in 1940 timber was sold at a gain of $3,122.55; and in 1940 a bond was sold at a gain of $1,600. Gains from sales of capital assets were reported in amounts of less than 100 percent. According to the books of account of the trust, distributions were made to the beneficiaries in 1939, 1940, and 1941 in the amounts of $12,304.84; $36,288.04; and $63,400. The expenses of the trust in the taxable years were for taxes, accounting fees, legal and recording fees, telephone, stationery, insurance, abstracts on leases, and a salary for one of the trustees. On March 20, 1940, all of the beneficiaries of the trust, in writing, ratified all acts of the trustees under the trust created on April 14, 1936. On the same day the trustees executed a new declaration of trust to effect certain changes. [1] The beneficiaries, in writing, on the above date, declared and voted a dissolution of the first trust to the extent required by the new declaration of trust. The parties are agreed that these declarations made on March 20, 1940, did not effect any changes in the terms of the trust which was first declared, and that the termination date of the second trust or amended *58 trust remained April 14, 1961. In the notice of deficiency, the Commissioner determined that the petitioner is an association taxable as a corporation, and upon that holding the Commissioner included in income 100 percent of the gains realized from the sale of longterm capital assets by petitioner during the taxable years. After respondent asserted deficiencies against petitioner, calculated at corporate rates, the trustees executed and filed capital stock tax returns for the capital stock taxable years ended June 30, 1938 to June 30, 1941, but they did so expressly denying that petitioner was an association taxable as a corporation and solely as a matter of protecting the rights of the petitioner. Petitioner is an association taxable as a corporation within the meaning of section 3797 of the Internal Revenue Code. Opinion The only question is whether petitioner, a trust, was a liquidating trust, *59 or a business trust, as respondent has determined. The answer to this question will determine whether petitioner should have treated long-term capital gains, realized in the taxable years, in the way a corporation must do, i.e., report the entire gain in taxable income. See section 117 (b) of the Internal Revenue Code. Petitioner reported only a percentage of its long-term capital gains in gross income. The law upon the question of whether a trust so closely resembles a corporation that it must be treated in the same way as a corporation for purposes of income tax, under section 3797 (a) (3), Internal Revenue Code, has been clarified in Morrissey v. Commissioner, 296 U.S. 344; Swanson v. Commissioner, 296 U.S. 362; Helvering v. Combs, 296 U.S. 365; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369. See Regulations 103, Section 19.3797-1, 2, 3; and Regulations 111, Section 29.3797-1, 2, 3. In many decisions since the above cases, we have construed the doctrines of the Supreme Court on this question, as enunciated in the cases above cited, to mean that the decisive factor in whether *60 a trust shall be taxable as such, or taxable as a corporation, is the character of the powers conferred upon the trustees in the trust instrument, rather than the types of activities actually carried on by the trustees. Lee H. Marshall Heirs, 39 B.T.A. 101, 110; Cleveland Trust Co., 39 B.T.A. 429, 435; Williams Trust, 39 B.T.A. 612, 624; Del Mar Addition, 40 B.T.A. 833, 837. See also Commissioner v. Vandegrift Realty & Investment Co., 82 Fed. (2d) 387, 390; Thrash Lease Trust v. Commissioner, 99 Fed. (2d) 925; Title Insurance & Trust Co. v. Commissioner, 100 Fed. (2d) 482. The Supreme Court in the Morrissey case laid emphasis on the terms of the trust instrument, saying "Its character [referring to the trust] was determined by the trust instrument." See, also, Helvering v. Coleman-Gilbert Associates, supra. In the present trust, there is no provision relating to liquidation as a purpose of the trust, and petitioner's contention that it was created for the purpose of liquidation, is founded solely upon certain testimony. Petitioner rests its claim largely upon the assertions *61 of one of the trustees and the attorney who prepared the trust instrument. On the other hand, respondent founds his contention upon the powers given to the trustees by the trust instrument, and particularly upon the provision which authorizes the trustees to carry on any business venture which they deem advisable on behalf of the trust. The name which this trust bears suggests that the trust had its origin in the administration of the estate of Phillip Bordages, or, that it came into being as a testamentary trust. Of course, that is not true. Phillip died in 1891, and there is a statement in the record that there was no administration of his estate. The facts that the members of the Bordages family, who, in fact, caused the trust to be created, held land as tenants in common, and received their interests, in large part, from two estates, cannot be determinative of petitioner's argument, in its favor. For example, in Malley v. Howard, 281 Fed. 363, 368, (affirmed in part sub nom, Hecht v. Malley, 265 U.S. 144, the situation was similar, where members of the Hecht family, holding real estate as tenants in common, created a real estate trust, for their own *62 benefit, to hold their undivided property, but the trust was held to be a business association. It should be noted that the members of the Bordages family had held their inheritance from their father undivided, as tenants in common, for a period of 45 years, and the record indicates that they had increased their joint holdings during those years. The record does not show, in detail, to what extent their holdings had been enlarged. The record in this case shows that for some time prior to the death of I.R. Bordages, there had been some production of oil from lands owned by the Bordages family. Presumably they had leased the mineral rights in some of their holdings, and it may be that they had acquired interests in leases or in royalties. The record is lacking in any description of the status of and the nature of all of the property at the time the trust was created. There is almost no description of the property which constituted the residue of the estate of I.R. Bordages. Also, although there is some brief testimony to the effect that the trustees have sold some of the trust property and distributed the proceeds to the beneficiaries, it is difficult to evaluate those instances of *63 sales in the administration of the entire trust property. It would assist this Court in its consideration of petitioner's contention if the following facts were known: (1) The number of transactions where sales of the fee title have been made and the size of the tract sold, during the existence of the trust. (2) The number of oil and mineral leases outstanding at the time the trust was created, as well as the number of leases, if any, in which the trust was given an interest when the trust was created, and the period for which the leases were to run. (3) The number of oil and mineral leases which the trustees executed from the time the trust was created, through the taxable years, and the periods for which such leases run. (4) The facts relating to the relative status of all of the property conveyed to the trustees in 1936 and at the close of the latest taxable year, to show some approximate percentage of the area of the entire holding of the trust on which oil and mineral leases were outstanding, and what part, if any, was not considered as potential oil producing property. (5) What was distributed in any instance to the trust beneficiaries after an oil lease had become productive, *64 i.e., the lease itself or only the royalties in cash. There is testimony, which is not clear, that, in one instance, a distribution was made to beneficiaries, after a lease had become productive, and the implication is that the lease, itself, was "distributed" to the beneficiaries. The meaning of this testimony is not clear. The trust instrument, has, attached, a list of the properties conveyed to the trust, but, in itself, that schedule does not provide the facts which we have attempted to outline, or indicate, above, and aside from said schedule, the record does not provide such facts. While the question to be decided may not always turn upon the activities of the trustees, as compared to the broad powers given to them by a trust, the kind of property, the kind of activities of the trustees, and the matters which must be looked after by the trustees is material, particularly when the taxpayer contests a determination that the trust is a business trust. And, here, without more facts along the lines we have suggested would be helpful, it is difficult to know the real merit of petitioner's contention that it is a liquidating trust. The evidence shows that the members of the Bordages *65 family were agreed that part of their joint holdings, at least part, had potential value in oil deposits. The value was under the land. And, it appears, that such potential value was not evenly distributed over all the properties, but some lands had more potential value than other lands. Some lands had been brought into the production of oil. One reason for creating the trust was to realize the potential value by executing leases of mineral rights. All of the owners of interests in all of the property would share in the proceeds to be derived from royalties. It was impossible to partition the joint holdings among the members of the family in such way that all would share in the unevenly distributed resources of the land. To partition the land could only result in giving the oil deposit lands to some and the non-oil deposit lands to others. An unequal distribution would result from a partitioning of the lands. The creation of a trust was a solution of the problems and of the inequities of a partition. Another purpose in forming the trust, was to simplify and facilitate the making of leases; to empower three trustees to make leases instead of following the cumbersome procedure of obtaining *66 the consent of and the execution of leases by all of the interested parties, who, in 1936, were seven. The trustees are empowered by the trust instrument to carry on any business on behalf of the trust. Thus, petitioner was purposed to engaged in business within the Coleman-Gilbert decision. But in addition to that general purpose, as stated in the trust instrument, the trustees could sell and lease the trust property, and invest and reinvest the trust property. They could make leases for any period of time, and amend, change, and modify leases, and grant options to lease and renew leases. They could "sell, convey or lease the coal, oil, gas or other minerals in or under any property in said Trust Estate". A schedule attached to the fiduciary return for 1940 reported receipt of a lease bonus payable in oil. The receipt of royalties or bonuses in oil would require the trustees to sell the oil to obtain cash to distribute to the trust beneficiaries. The making of leases and the selling of oil are business activities. Although the evidence is limited, it is clear that the trustees of petitioner not only were empowered to engage in business, but they entered into various transactions. *67 The making of leases and selling oil has required the trustees to make business judgments. Whether such business judgments and transactions were made in years prior to the taxable years is not material. Reading the trust instrument in its entirety, we find that it does not show a purpose to liquidate the property during the period of the trust, but, rather, it shows a purpose to realize profits from the property. Petitioner's contention that it was a liquidating trust finds little support in the evidence. The trustees were not limited in their functions to business activities which would be only incidental and necessary in preserving property, nor limited merely to collecting income from property. Cf. Crocker v. Malley, 249 U.S. 223; Helvering v. Washburn, 99 Fed. (2d) 478; Hugh MacRae Land Trust, 1 T.C. 899; Frederick Pitzman et al. Trustees, 36 B.T.A. 81. Petitioner, as far as its form is concerned, resembles a corporation in the characteristics which were said to be important in the Morrissey case. Seven persons transferred certain of their property to three named persons as trustees who were to hold the property during *68 the 25 year life of the trust and were authorized to manage and deal with it in their discretion in every way in which an owner might do. In event of a trustee's death, resignation, incapacity or failure to act, a majority in interest of the beneficiaries might appoint a new trustee to replace him. Management of the enterprise was vested solely in the trustees. In event of the death of any beneficiary prior to the termination of the trust. his or her interest passed subject to the terms of the trust according to his or her will, or, if no will, then according to the laws of descent and distribution of Texas. No beneficiary or trustee was to be personally liable in any manner on any note, mortgages or other obligations created by the trustees, and persons dealing with the trustees were required to look solely to the trust estate. No certificates of interest were issued. The trust had no seal and regular meetings of the trustees and of the beneficiaries were not held. By the vote of a 75 per cent beneficial interest the trust could be terminated at any time. "No assignment, order or transfer, written or verbal of any beneficiary by way of anticipation or otherwise of any part of the *69 income and principal of the trust shall be paid by trustees to anyone except directly to the beneficiary." With the exception of the provisions of the last above sentence, the factual situation here presented is substantially the same as that presented in W. P. Halliday, 38 B.T.A. 518, 527-528. That which the Board said, beginning the middle of page 527 of the report, is referred to now without repetition here. In view of what has been said in the cases of Morrissey, Coleman-Gilbert Associates, and Halliday, supra, it is apparent that all the principal characteristics of an association as enumerated by the Supreme Court are here present, with the possible exception that there was not any facility of transfer of of beneficial interests so as to permit the introduction of large numbers of participants, in that the trustees were not permitted to recognize assignments or transfers of beneficial interests either in the income or principal of the trust. So far as disclosed the restrain on transfers and assignments of beneficial interests was imposed upon themselves by the beneficiaries, and to that extent was not unlike a stockholder placing a stock in a voting trust under *70 terms which would prevent him from transferring it to another. In view of this, and since a large number of stockholders of beneficial interests is not required to constitute an association, and since all the other principal characteristics of an association are here present, we are of the opinion that so far as form is concerned the petitioner is to be regarded as an association taxable as a corporation. The weight of authority requires the conclusion, and it is concluded that "petitioner was organized in corporate form with powers to undertake the operation of a business, and hence that it is an association taxable as a corporation". St. Louis Oil Royalty Trust, 5 T.C. 179, 183; Kettleman Hills Royalty Syndicate No. 1 v. Commissioner, 116 Fed. (2d) 382, certiorari denied, 313 U.S. 582; Nebo Oil Co., Trust, 126 Fed. (2d) 148, certiorari denied, 317 U.S. 636; Adkins Properties v. Commissioner, 143 Fed. (2d) 380; Title Insurance & Trust Co. v. Commissioner, supra; Commissioner v. Security-First National Bank of Los Angeles, Trustee, et al., 148 Fed. (2d) 937. Respondent's determination *71 is sustained. Petitioner advances the argument that it was not a valid trust under Texas law. Petitioner argues that a trust for a gross term of 25 years violates the rule against perpetuities. In Adkins Properties v. Commissioner, supra, a trust was declared for a period of 25 years, or longer. The trust was created in Texas. No question under the rule against perpetuities was raised. Under this trust both the legal title and the beneficial interests were vested immediately. 48 Corpus Juris 986. The validity of petitioner's argument is doubtful as a matter of law. However, the question in issue does not require our making any determination of whether petitioner was a valid trust under the standards of the local law. The Internal Revenue Code, section 3797 (a) (3) makes the term "corporation" include associations. Petitioner does not seriously deny that, in any event, the members of the Bordages family could be considered to have associated themselves together under a written agreement, and it is not material to the consideration of the issue presented whether or not the agreement created a trust in strict compliance with local statutes. Whatever *72 the formal character of the relationship established by the instrument which created "The Phillip Bordages Estate Trust", it provided an efficient medium for the conduct of business and the sharing of gains, resembling a corporation under the standards set forth in Morrissey v. Commissioner, supra.See Commissioner v. Fortney Oil Co., etc., 125 Fed. (2d) 995, 997. If petitioner is not technically a trust under Texas law, a question which we do not decide, it is nevertheless an association taxable as a corporation under the Federal Revenue statutes. Burk-Waggoner Oil Ass'n v. Hopkins, 269 U.S. 110. Cf. G. E. Jordan, Trustee, 28 B.T.A. 372. Decision will be entered that there are deficiencies in income tax liability, and that there are no deficiencies in declared value excess profits tax. Footnotes
1. This declaration of trust is not in evidence. This case has been tried under an apparent agreement between the parties that the terms of the declaration of trust dated April 14, 1936 were not amended or changed by this subsequent declaration of trust.↩